## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RICHARD WERSHE, JR,

Case No. 22-cv-12596

*Plaintiff,*

*v.*                                         Hon. _____

UNITED STATES of America; jointly
and severally,

*Defendants*

**COMPLAINT AND JURY DEMAND**

---

AYAD LAW, PLLC
Nabih H. Ayad (P59518)
Attorney for Plaintiff
645 Griswold St., Ste 2202
Detroit, MI 48226
P: 313.983.4600
F: 313.983.4665
filing@ayadlawpllc.com

---

*This is a companion case which alleges similar facts to those in Case No 21-cv-11686 currently pending before the honorable judge Shalina D. Kumar. Plaintiff is filing this complaint to preserve his rights under the law, in consideration of the statute of limitations found at 28 USC § 2401(b).*

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

## COMPLAINT

NOW COMES, Plaintiff Richard Wershe, Jr (hereinafter "Plaintiff"), by and through his attorneys at Ayad Law, PLLC, and does hereby make the following complaint:

## PRELIMINARY STATEMENT

It is anticipated that Defendants in this action will assert a defense based on the statutory limitations periods of Plaintiff's causes of action. However, the undersigned counsel has done extensive research as to that issue, and feels confident in bringing this action based on the relatively recent (and commendable) trend of federal courts to apply equitable tolling of limitation periods in cases brought by recently released prisoners against the criminal justice system and those that had the power to keep them imprisoned. "Thus, the Court concludes that in the prison context, reasonable fear of retaliation may be sufficient to constitute extraordinary circumstances warranting equitable tolling, particularly if the person threatening retaliation is a defendant or another official who could be or was influenced by a defendant." *Davis v Jackson*, No. 15-CV-5359 (KMK), 2016 WL 5720811, at *11 (SDNY, September 30, 2016).

The emerging doctrine holds that when a prisoner has a legitimate fear of retaliation for exercising their rights, equitable tolling must be considered. Here, Plaintiff Wershe actually has been retaliated against by the justice system, and received wise counsel from his prior two attorneys (William Bufalino and Ralph

Musilli) to forego seeking legal redress until he was out of prison for fear of retaliation.[1]

## THE PARTIES

1. Plaintiff RICHARD J. WERSHE, Jr. is a recently released prisoner. Plaintiff is also known by the pseudonym White Boy Rick, a name given to him by the news media and never used by himself or his acquaintances. Born July 18, 1969, Plaintiff spent 32 years and 7 months in prison, only being released last year on July 20 of 2020. Plaintiff is the longest serving sentence bestowed on a minor, for a nonviolent offense, in the history of the State of Michigan, 32 years and 7 months; His entire adult life until his release less than a year ago. Prior to his arrest in 1987, and as of now in 2021, Plaintiff resides in Eastern District of Michigan.

2. Defendant, UNITED STATES, is liable for the torts of the federal actors in its employ pursuant to the Federal Torts Claims Act.

## JURISDICTION & VENUE

3. The jurisdiction of the Court is invoked pursuant to the Federal Torts Claims Act, 28 USC § 1346(b) *et seq.*

---

[1] See attached Affidavits of Richard J. Wershe, Jr., his fiancée Michelle MacDonald, and his former attorneys widow Ms. Lynn Hoover.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

4. Under U.S. Const. Art. III §2, this Court has jurisdiction because the rights sought to be protected herein are secured by the United States Constitution. Jurisdiction is proper pursuant to 28 U.S.C. § 1331, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), *et seq*., 5 USC § 702, 5 USC § 706, the United States Constitution, and federal common law.

5. This action seeks declaratory relief pursuant to the Declaratory Judgement Act, 28 USC §§ 2201-2, Rules 57 and 65 of the Federal Rules of Civil Procedure, and pursuant to the general, legal, and equitable powers of this Court.

6. This action seeks damages pursuant to 28 USC § 1343(a)(4) and 28 USC § 1357.

7. Venue is proper under 28 USC § 1391(e) because the Defendants in this action are United States officers or employees and a substantial part of the events giving rise to the claims herein occurred in this judicial district for the Eastern District of Michigan.

## ADMINISTRATIVE CLAIMS EXHAUSTED

8. Plaintiff has filed administrative claims with the appropriate government agency, the Department of Justice.

9. Plaintiff has had their administrative claims administratively denied via letter dated April 28, 2022, attached.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

10. Plaintiff has now met all conditions precedent to a Federal Torts Claims Act action.

## FACTUAL BACKGROUND

### CHAPTER ONE: CHILD ABUSE

11. In 1980's Plaintiff sister started dating a known drug dealer. Plaintiff's father became concerned and contacted the FBI to ask if they could help get this drug dealer out of her life.

12. In 1984, FBI Agent James (Jim) Dixon (the estate of which is sued here as represented by surviving spouse Carol Dixon, hereinafter all referenced collectively as "Dixon") met with Plaintiff's father at a McDonalds, where he had taken Plaintiff. Dixon agreed to help Plaintiff's father on the condition that Plaintiff's father identify individuals in photographs which Dixon had brought with him.

13. There, Plaintiff was able to identify most of the individuals in the photographs because, like nearly all of his classmates and neighborhood friends, he knew the individuals from neighborhood gossip.

14. Dixon was apparently impressed with Plaintiff's knowledge, because within a few days, he drove up alongside Plaintiff as he walked home from school and told Plaintiff to "get in" to his vehicle.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

15. Plaintiff, being a 14-year-old child with the fear of law enforcement common to East Detroiter's at that time, felt compelled to do as he was told by this law enforcement agent, a figurative and literal authority figure.

16. Although he did not want to out of fear, Plaintiff complied with Dixon's demands

17. Mr. Dixon's unannounced visits with Plaintiff quickly became a regular occurrence, occurring dozens of times over the course of the next several months, with Dixon introducing Plaintiff to other law enforcement from both the Federal Bureau of Investigations ("FBI") and the Detroit Police Department ("DPD") that were part of a joint taskforce (the "taskforce").

18. At no point during his time working as a confidential informant did Plaintiff feel he was free to disobey the taskforce officers when they demanded he get into their vehicles.

19. Although the taskforce agents and officers made absolutely clear to Plaintiff that he was not to speak of their dealings to anyone, in order to attempt to cover their abuse, they would occasionally give Plaintiff some cash to keep from talking.

20. Knowing how fundamentally wrong and outrageous it was to endanger a child, Dixon and the taskforce hid this fact in their official files by using Plaintiff's father's name, Richard J. Wershe, Sr., in their reporting, instead of Plaintiff's name: Richard J. Wershe, Jr.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

21. In approximately August of 1984, Dixon introduced Plaintiff to his coworker, FBI Agent Herman (Herm) Groman ("Groman").

22. Dixon then stopped interacting with Plaintiff while Groman began accosting Plaintiff much more frequently than Dixon had, multiple times a week and sometimes each day for several days in a row.

23. Like Dixon, Groman would randomly accost Plaintiff while he walked to or from school, to the store, to friends' houses, to or from the basketball court, or even show up at Plaintiff's home unannounced.

24. **Unlike Dixon, Groman asked for Plaintiff to act as more than just an informant and began having Plaintiff engage in extremely more dangerous criminal drug-related activity.**

25. Thereupon, Groman introduced Plaintiff to DPD officers William (Billy) Jasper ("Jasper"), Kevin Greene ("Greene") who were part of the task force.

26. Although Plaintiff was hesitant to keep cooperating, Groman and the task force pressured Plaintiff to continue down this dangerous path, thereby risking his life.

27. Plaintiff, at the tender age of 15 years, was of a malleable and impressionable mindset and did what the FBI agent and DPD officers demanded he do, that is go into drug houses he did not know, in areas of the city he did not know, and ask to buy drugs from people he did not know, because Groman, Jasper,

Greene and other law enforcement officers assured him that they "would be right there" if anything went wrong.

28. **At the time, being a child, Plaintiff did not fully comprehend that, despite their supposed best intentions, the task force would be completely unable to save him should one of the many violent drug dealers or their criminal henchmen decide to shoot Plaintiff for nosing in on their drug operation**.

29. **In the months of August, September, October, and November of 1984, Groman, Jasper, and/or Greene would pick Plaintiff up in his car and make him go purchase drugs from drug houses throughout the greater Detroit area, return with the drugs, allow them to take a small sampling of the drugs, and then leave with the remainder of the drugs, with instructions to sell them.**

30. Plaintiff, although clearly an adolescent with little business sense, thanks to the task force, was frequently in the same place, at the same time as Johnny Curry, the leader of a dangerous drug-trafficking gang known as the Curry Gang or the Curry Brothers Gang.

31. It is no surprise that then that Plaintiff likely raised suspicion amongst these dangerous criminals, who likely suspected him to be an informant.

32. In November of 1984, there was an attempted assignation of Plaintiff whereby he was shot at point blank range with a .357 magnum, cutting his large intestine in half and, and only surviving by the grace of God.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

33. **Grosman, Jasper, and Greene went to see Plaintiff in the hospital for the sole purpose of persuading and coercing him into lying about the circumstances of his attempted assassination**.

34. **Instead of pulling him out, they further endangered him by coercing him to stay a confidential informant.**

35. After being shot, Plaintiff did as he was told by Groman, Jasper, and Greene and lied about his attempted murder, stating that it was all just a big "accident."

36. Yet, it was obvious to most that the shooting was not an accident, Plaintiff was told to cover it up to greatly increase his credibility on the 'streets' and, more importantly to Jasper, Greene, Dixon, and Groman that it would allow them to continue their abuse of Plaintiff.

37. Not only did Jasper, Greene, Dixon, and Groman continue their abuse, but Plaintiff ended up doing far more 'jobs' for the task force after he was shot than he ever did before he was shot.

38. In fact, Groman gave 15-year-old Plaintiff a fake ID stating that he was 21 and sent him to Las Vegas with thousands of dollars of cash, to go undercover.

39. When Plaintiff was first criminally charged, he gained notoriety in the local news and been dubbed by the media as "White Boy Rick."

40. The media dubbed Plaintiff a drug "king pin," and accusation that was false in every sense.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

41. Plaintiff had no employees, agents, or underlings, and no criminals had allegiance to Plaintiff, at any time.

42. Plaintiff was young and completely unable to comprehend in an adult sense the dangers of being a 'rising star' in the drug trade in a highly contested drug-war battleground of 1980's Detroit.

43. Plaintiff's fame and notoriety made him a local legend amongst his peers, but amongst adults as well.

44. In 1987, when the media coverage of "White Boy Rick" exploded, Plaintiff became a local and national celebrity, easily recognized and often followed and photographed by Detroit news reporters.

45. By this time, Grosman, Jasper, Greene, and the other members of the task force had ended their contacts with Plaintiff, likely to save themselves from legal action should they have been caught using a 14/15-year old as a drug dealer-informant.

46. Plaintiff was now a 16-year-old child, known on sight by most of Detroit as a notorious drug king pin, in a city being ravaged by drug warfare, both between rival drug gangs and the Detroit Police Department, and with no trusted adults that he could contact for any guidance.[2]

---

[2] The task force that Plaintiff had worked with focused on two types of criminals, Curry Gang members and corrupt Detroit Police Officers. Accordingly, Plaintiff was afraid of ever having to call on the Detroit Police Department (outside of the task force) for help.

47. Accordingly, criminals attempted to murder Plaintiff on multiple occasions.

48. On one occasion, a drive-by shooting occurred at Plaintiff's father's house while Plaintiff's jeep was parked outside. His father's house was shot, 15 to 20 bullets struck his jeep, and at least one bullet flew within a foot of Plaintiff's father's head while he sat and watched television in his family room.

49. On another occasion, Plaintiff was the passenger of a car in which he was driving with his friend, Roy (last name unknown), and a van pulled up alongside them while they were stopped at a light at Harper Avenue and Outer Drive, when the van's door swung open and an occupant opened fire on Plaintiff.

50. Plaintiff's friend ran the red light, sped through the intersection, and the pair escaped uninjured.

51. But hitmen should not have been Plaintiff's only concern. Now that he was falsely promoted as a drug king pin in a city which was clamoring for law enforcement to punch back at the drug traffickers, Plaintiff was also an irresistible target for Detroit Police Officers, whom potentially knew nothing of Plaintiff's past career as an informant with a specialized federal-local joint "task force." **Thanks to Jasper, Greene, Dixon, and Groman, Plaintiff had become a target for the drug gangs as well as a target for law enforcement**.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

52. Accordingly, on May 22, 1987, at the age of 17, upon information and belief, Plaintiff was set up and taken down by Detroit Police.

53. While driving to his grandmother's house with a friend (where Plaintiff often parked his car), Plaintiff and his friend were pulled over by Detroit Police.

54. There, although Plaintiff allowed the DPD officers to search his vehicle, a conflict ensued as the DPD officers became aggressive with Plaintiff and his friend.

55. Frightened, Plaintiff did as any child would do, and ran away.

56. When DPD caught Plaintiff less than an hour later, they beat him so badly, including whipping him with their pistols, that he had to be hospitalized at Detroit Receiving Hospital overnight.

57. Hours after Plaintiff's hospitalization at the hands of DPD, DPD allegedly received a 911 call tipping them off to a large box full of cocaine that was later used as evidence against Plaintiff in the case that put him in prison for 32 years 7 months.

58. **This was despite the fact that none of the many witnesses who witnessed Plaintiff flee that day saw Plaintiff running with a box, despite trying the DPD forensic technicians could recover no fingerprints from the box, and when the 911 tape was requested DPD stated that the 911 call had happened right as the tape was being changed, so they claimed there was not tape recording to give**.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

59. In 1978, Michigan passed what became known as the 650-lifer law (MCL 333.7401) which, before its revision, **mandated that anyone convicted of possessing 650 grams of cocaine or more be sentenced to life without the possibility of parole**.[3]

60. At his trial, Plaintiff was alleged to have possessed more than 650 grams of cocaine with an intent to distribute it.

61. **In 1987, while still a minor, Plaintiff was convicted and sentenced to life without parole**.[4]

### CHAPTER TWO: THE US GOVERNMENT'S CONTINUED UNLAWFUL ACTION

62. In 1991, while Plaintiff was in prison, Groman introduced Lynn Helland ("Helland") an Assistant United States Attorney with the Eastern District of Michigan.

63. Both Groman and Helland wanted Plaintiff to play a key role in a large sting-operation to take down corrupt Detroit Police and politicians, among others. This was deemed "Operation Backbone."

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

---

[3] After Plaintiff's sentencing, Reforms to the 650-lifer law in Michigan drug crime cases now have changed the mandatory life sentence requirement to 20 years to life, **with eligibility for parole**.

[4] This sentence, as applied to Plaintiff, was later held unconstitutional by the Supreme Court of the United States: "1) Eighth Amendment prohibits imposition of life without parole sentence on juvenile offender who did not commit homicide, and 2) State must give juvenile nonhomicide offender sentenced to life without parole meaningful opportunity to obtain release." *Graham v Florida*, 560 US 48; 130 S Ct 2011; 176 L Ed 2d 825 (2010), as mod (July 6, 2010).

64. Although Plaintiff initially did not want to participate, Helland persisted and persuaded the then 20-year-old Plaintiff that if he helped them, **they would always do everything in their power to get Plaintiff released from prison**.

65. Operation Backbone was a success, with some 13 Detroit Police and public officials being arrested as a result of the operation.

66. Helland then, arranged to have Plaintiff placed in the witness protection program while in prison, out of fear that elements of the corrupt Detroit Police Department that he had helped to strike a blow, would be able to retaliate against him while he was imprisoned.

67. This relocation and giving of a fake identity had a massive psychological effect, (essentially cutting Plaintiff off from his family to the point that he did not see his father for 15 years and saw his mother only twice in as many years) on Plaintiff as the thought that the same law enforcement that he had looked up to as a child, and worked with, just a few years ago, would potentially have him killed while he was in prison, drove home for Plaintiff the absolute dehumanizing vulnerability that accompanied being locked up; his existence was not just jeopardized by prison gangs, but by the entire *justice* apparatus itself.

68. **Now, after having to be relocated into the witness protection program, Plaintiff's attorney William Bufalino's advice to not attempt legal action**

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**against any of the law enforcement that had caused his imprisonment made sense in an entirely more serious way.**

69. **Plaintiff was terrified of his captors. And the hopelessness inevitably instilled by his sentence of life without parole sapped the 'fight' out of him the entire time he was incarcerated**.

70. In approximately 1992, federal agents from the Drug Enforcement Agency ("DEA") along with Assistant United States Attorneys ("AUSA") from the Eastern District of Michigan E. James King ("King") approached Plaintiff for more life-risking help and asked him to testify before a grand jury against members of the Best Friends gang.

71. Once again fearing for his safety, Plaintiff at first refused.

72. Yet King assured Plaintiff that he had nothing to worry about because he guaranteed the indictments of these criminals and Plaintiff's testimony before the grand jury would always be sealed and never be released, specifically to protect those testifying against the gangsters.

73. This guarantee from the Assistant United States Attorney assuaged Plaintiff's fears and he agreed, on the condition that King do everything in his power going forward to assist Plaintiff in getting his sentence commuted.

74. **King agreed to do everything in his power to get Plaintiff's sentence commuted in exchange for his grand jury testimony against the very dangerous and deadly 'Best Friends' gang.**

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

75. **The parties having reached an agreement, sometime between 1992 and 1993, Plaintiff testified before the grand jury regarding the Detroit gangsters and drug pushers as requested, giving very powerful testimony against the Best Friends gang.**

76. **At the grand jury testimony, he was again assured that nothing he said could ever be used against him in any way**.

*CHAPTER THREE: THE UNLAWFUL RENEGING ON THE AGREEMENT*

77. In July of 1998, Michigan's Governor John Engler reformed the Michigan lifer law, allowing prisoners such as Plaintiff to become eligible for parole after serving 15 years in prison.

78. After the reforming of the law, Plaintiff became eligible for parole in 2002 and was in early 2003, Plaintiff was given notice by the Michigan Parole Board of his upcoming March 2003 parole hearing.

79. Plaintiff felt that, finally, all of the life-endangering work he did for FBI agent Groman, the DEA agents, AUSA Helland, and King, while in prison was about to pay off with the Groman, Helland, and King keeping their end of the agreement.

80. Without Plaintiff, Operation Backbone would never have happened and the 13 corrupt Detroit Police Department officials would never have been charged.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

81. Without Plaintiff, members of several Detroit's infamous drug gangs would never have been taken off the streets.

82. In preparation for his parole hearing, Plaintiff began calling the Justice Department actors that had promised to help him: starting with Assistant United States Attorney Lynn Helland, the head of the public corruption unit at the Eastern District of Michigan, to ask for him to do his end of the agreement and advocate at the hearing.

83. **Plaintiff, however, received devastating news from Helland. Namely, the deal was off and that they would not be performing their end of the agreement.**

84. **Helland informed Plaintiff that one of his superiors at the office had told him he, he nor James King could advocate for Plaintiff in the future because the United States Attorneys Office for the Eastern District of Michigan now had an official stance regarding Plaintiff: That they did not support his release (breaching their agreement with Plaintiff).**

85. **The United States Attorneys Office for the Eastern District of Michigan sent a letter to that effect to the Michigan Parole Board to consider at Plaintiff's hearing.**

86. Plaintiff experienced then a worse heartbreak and suffocating sense of hopelessness than he felt when he was first convicted of life without parole.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

87. Come the day of his parole hearing, Plaintiff's nightmare turned surreal as Detroit Police Officers that he had never met before testified at his hearing, quoting directly from Plaintiff's sealed grand jury testimony.

88. Plaintiff had been assured years earlier, in the mid 1990's, that his grand jury testimony would never become public and could never be used against him.

89. If he had not received that promise, Plaintiff never would have testified as he did before the grand jury, for his own safety and well-being.

90. In a bathroom break at his hearing, Plaintiff told his then attorney, Bufalino, that the Parole Board was quoting from his sealed testimony before the grand jury.

91. Bufalino's response was to tell Plaintiff not to dare make the accusation that his sealed testimony had been illegally distributed at the hearing and further to keep his mouth shut about it until after he get out of prison.

92. One of the Detroit Police Officers who Plaintiff never met before and who testified against Plaintiff was William Rice ("Rice").

93. Upon information and belief, at the time of Plaintiff's hearing, Rice was the head of, or a high-level official in, the Detroit Police Department's homicide division.

94. **In 2016, Rice signed a sworn affidavit stating that prior to Plaintiff's hearing, he had received a curated transcript of the testimony which Plaintiff gave to the grand jury and which was supposed to be sealed**.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

95. Although officer Rice did not know Plaintiff he came and testified before the parole board as though he had dealt with him based on the illegally released grand jury testimony. Hence, the grand jury testimony that Plaintiff was assured would never be used against him, was used against Plaintiff to deny him parole.

### AFFIDAVIT OF WILLIAM R. RICE

STATE OF MICHIGAN      )
                       ) ss
COUNTY OF Manistee     )

I, WILLIAM R. RICE, being first duly sworn, verify and affirm that the following statements and information are made freely and voluntary:

1. My name is William R. Rice. I was a Detroit Police Officer for 35 years, prior to my retirement in 2006. For 29 years of my police career, I was assigned to the homicide section.

2. During the period of time I was in the homicide section, I was thoroughly knowledgeable with every homicide investigation that was opened or ongoing.

3. In or about 2003 I was contacted and informed that I had been selected by my superiors to testify at a parole hearing for Richard Wershe, Jr., also known as "White Boy Rick".

4. I advised the prosecution that, while I was aware of the impact that drugs were having on the community, the violence associated with the drug trade, and the difficulties involved in investigating drug related homicides, I did not know Richard Wershe, Jr.[5]

---

[5] This document has been reviewed and verified by Plaintiff.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

96. **Someone at the United States Attorneys Office for the Eastern District of Michigan (herein named as Unknown Assistant United States Attorney) had unlawfully published the sealed testimony to be used against Plaintiff at his hearing before the Michigan Parole Board**.

97. **The significance of this leaked document is not to be taken lightly as the grand jury testimony that was presented to the Michigan Parole Board absolutely materially was the dispositive factor in the Board's decision to not allow Plaintiff parole, as it associated Plaintiff with the very dangerous Best Friends gang network.**

98. **This information about Plaintiff's iner dealings and knowledge of the Best Friends gang would never have been able to be known had it not been for Plaintiff's own grand jury testimony which he would have never given had he known that 1) Groman, Helland, and King were going to reneg on their deal and 2) that they would go even further and use the testimony to keep him in prison for another 17 years of hell.**

99. The results of the publishing of Plaintiff's sealed testimony were, as expected, that he was denied parole at his 2003 hearing.

100. The psychological and emotional effects from Plaintiff's utter betrayal at the hands of Helland, Groman, King, and the Unidentified AUSA cannot be overstated.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

101.     After 2003, Plaintiff fell into deep depression and despair for many years.

102.     During his depression, and desiring some emotional connection to the outside world and to his family, Plaintiff attempted to facilitate the purchase of a car for his mother from Florida while in prison.

103.     In 2005, Plaintiff was charged with racketeering.

104.     After being kept in solitary confinement for 16 months, Plaintiff was given an ultimatum by the Florida prosecutor: Either plead guilty, or they would indict Plaintiff's mother and sister.

105.     Plaintiff chose to spare his mother and sister, and pled guilty to the trumped and ridiculous charges.

106.     The judge in the Florida case even made a note of this on the record, stating that Plaintiff had only agreed to the guilty plea because the Florida prosecutor had threatened to indict his mother and sister.

107.     Plaintiff was sentenced to five years in Florida prison, to be served after his life sentence.

108.     In approximately 2004, Plaintiff became represented by new counsel, Mr. Ralph Musilli ("Musilli") who began working diligently to get Plaintiff released from prison.

109.     **Plaintiff, having all but resigned himself to the belief that he would spend the rest of his life in prison, inquired with Musilli about potentially**

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**taking legal action against Jasper, Greene, Dixon, Groman, Helland, and King, but Musilli assured Plaintiff there was a real possibility of him being released on parole and, therefore, Plaintiff did not take action against these named individuals because he truly believed they would exert their vast influence unduly to keep him in prison**.

110.    In 2017, Plaintiff was finally paroled by the Michigan Parole Board.

111.    He never left government custody, however. Instead, Plaintiff was transferred immediately to a Florida prison, where he served five years.

112.    Plaintiff was finally released from prison on July 20, 2020.

113.    Plaintiff had spent 32 and 7 months years in prison.

114.    But-for Plaintiff's work as a confidential informant in the 1980's, Plaintiff never would have been shot.

115.    But-for Plaintiff's work as a confidential informant in the 1980's, Plaintiff never would have been sentenced to life in prison without parole.

116.    But-for Plaintiff's key role in Operation Backbone in the early 1990's, Plaintiff never would have had to have been placed in the witness protection program and lived in fear of his life while in prison.

117.    But-for Plaintiff's testimony to the grand jury in the mid-1990's, which Plaintiff was promised could never be used against him, Plaintiff never would have lost his chance at being paroled in 2003 and would not have had to do 17 additional grueling years in Prison.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

## COUNT I
**Michigan State Torts brought pursuant to 28 USC § 1346(b) *et seq*.**
**Negligence/Wanton Misconduct**
**Indoctrination of Child into Criminal Society**

118.     Plaintiff incorporates by reference the foregoing paragraphs as if fully restated hereunder.

119.     Because they were law enforcement agents tasked with protecting the public, because they were adults dealing with a minor, and because they were often de facto custodians of Plaintiff, Dixon and Groman owed a duty to Plaintiff not to indoctrinate him into criminal society, give him drugs, give him money to purchase drugs, and instruct him in drug dealing.

120.     This duty is clear from the history of our culture and was or should have been obvious to the law enforcement officers that taught Plaintiff to deal drugs.

121.     Dixon and Groman taught Plaintiff how to deal drugs and encouraged him, with the undue influence of adult authority figures over children, in this behavior and as a direct result, Plaintiff became a drug dealer.

122.     The upholding of the right of children to be free from government grooming or indoctrination must be upheld if the United States of America is to have a free and ordered society.

123.     Dixon's and Groman's actions in continuously taking 14-16-year-old Plaintiff into their custody and control, couching him on how to commit

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

serious felonies, providing him with large amounts of illicit drugs, and instructing him on how to behave like a high-level criminal, absolutely shocks the conscience to the point were several documentaries and a Hollywood film have been made recounting the almost unbelievable sequence of governmental abuses.

124.     But-for Dixon's and Groman's actions in grooming and indoctrinating Plaintiff into becoming a notorious drug dealer, Plaintiff would never have been shot in the abdomen at point blank range with a .357 magnum.

125.     But-for Dixon's and Groman's actions in grooming and indoctrinating Plaintiff as a child, Plaintiff never would have spent his entire adult life (32 years and 7 months) up until now in the small, dark, cages that were his prison cells.

126.     As a direct result of Dixon's and Groman's above-described unlawful acts, Plaintiff suffered 32 and 7 months years in prison. Plaintiff still suffers residual physical and psychological injuries as a direct result of Dixon's and Groman's above-described actions including but not limited to: severe anxiety, severe depression, severe paranoia, severe digestive issues, and incurable abdominal pains.

127.     These consequences of Dixon's and Groman's actions were obvious and foreseeable, especially as they were seasoned FBI drug task force agents,

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

and yet Dixon and Groman continued their actions with either a reckless disregard for the consequences, or willful knowledge of them.

WHEREFORE, as Plaintiff's injuries are a direct result of Dixon's and Groman's clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

**COUNT II**
**Michigan State Torts brought pursuant to 28 USC § 1346(b) *et seq*.**
**Intentional Infliction of Emotional Distress**
**Indoctrination of Child into Criminal Society**

128.     Plaintiff incorporates by reference the foregoing paragraphs as if fully restated hereunder.

129.     Dixon and Groman's conduct in recruiting, instructing, and coercing Plaintiff into drug trafficking at the age of 14 is extreme and outrageous conduct which cannot be tolerated in our society.

130.     So too was their conduct in continuing to use Plaintiff to deal drugs and inform on drug dealers even after Plaintiff's attempted assassination, which also showed Dixon and Groman's recklessness or, more likely, intent.

131.     Dixon and Groman taught Plaintiff how to deal drugs and encouraged him, with the undue influence of adult authority figures over children, in this behavior and as a direct result, Plaintiff became a drug dealer.

132.     Dixon's and Groman's actions in continuously taking 14-16-year-old Plaintiff into their custody and control, couching him on how to commit

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

serious felonies, providing him with large amounts of illicit drugs, and instructing him on how to behave like a high-level criminal, absolutely shocks the conscience to the point were several documentaries and a Hollywood film have been made recounting the almost unbelievable sequence of governmental abuses.

133.     But-for Dixon's and Groman's actions in grooming and indoctrinating Plaintiff into becoming a notorious drug dealer, Plaintiff would never have been shot in the abdomen at point blank range with a .357 magnum.

134.     But-for Dixon's and Groman's actions in grooming and indoctrinating Plaintiff as a child, Plaintiff never would have spent his entire adult life (32 years and 7 months) up until now in the small, dark, cages that were his prison cells.

135.     As a direct result of Dixon's and Groman's above-described unlawful acts, Plaintiff suffered and still suffers residual physical and psychological injuries as a direct result of Dixon's and Groman's above-described actions including but not limited to: severe anxiety, severe depression, severe paranoia, severe digestive issues, and incurable abdominal pains.

WHEREFORE, as Plaintiff's injuries are a direct result of Dixon's and Groman's clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

## COUNT III

**Michigan State Torts brought pursuant to 28 USC § 1346(b) *et seq*.**
**Fraud/Negligent Misrepresentation**
**Breaching Promise of Immunity**

136.     Plaintiff incorporates by reference the foregoing paragraphs as if fully restated hereunder.

137.     In exchange for Plaintiff's life-endangering assistance in Operation Backbone, Groman, Helland, and King agreed to advocate for Plaintiff's release from prison at a meaningful time and in a meaningful way.

138.     Plaintiff acted in reliance on the Groman's, Helland's, and King's promise that they would vehemently advocate for his release, at a meaningful time and in a meaningful way, when he cooperated against his former close friend Cathy Valos and many Detroit Police Department officials in Operation Backbone.

139.     Groman, Helland, and King held themselves out as having authority from their respective organizations, the FBI and the US Attorneys Office for the Eastern District of Michigan.

140.     After Plaintiff fulfilled his end of the bargain, those representations proved false when Plaintiff's then attorney was forced to subpoena Groman to testify, and when the US Attorneys Office for the Eastern District of Michigan sent a letter to Plaintiff's parole board opposing Plaintiff's parole.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

141.    Groman, Helland, and King either recklessly or knowingly misrepresented that they had the authority to advocate for Plaintiff's release, when they did not.

142.    Groman, Helland, and King either recklessly or knowingly misrepresented that the FBI and US Attorneys Office for the Eastern District of Michigan would support Plaintiff's release, when they did not.

143.    Groman, Helland, and King representations were proven false, when in 2003 at his first parole hearing they refused to advocate for Plaintiff's release and, in fact, Helland and King's office advocated for his permanent incarceration.

144.    Plaintiff suffered severe injury as a direct result of Groman's, Helland's, and King's above-described actions in the form of doing another 17 years in prison, in having his parole denied, in having his hope and faith in humanity shattered.

145.    Plaintiff's injury was suffered anew every day for the entire remainder of his time in prison as he was burdened with the residual paranoia that comes with having been an informant against members of gangs with prison presences and corrupt police officers which require one to be put into a witness protection program while in prison.

WHEREFORE, as Plaintiff's injuries are a direct result of Groman's, Helland's and King's clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

### COUNT IV
**Michigan State Torts brought pursuant to 28 USC § 1346(b)** *et seq.*
**Fraud/Negligent Misrepresentation**
**Publication of Sealed Grand Jury Testimony**

146.     Plaintiff incorporates by reference the foregoing paragraphs as if fully restated hereunder.

147.     In exchange for Plaintiff's life-endangering assistance in giving sealed grand jury testimony against high-ranking members of powerful drug gangs, Helland and King agreed both that Plaintiff's testimony would never be used against him and to advocate for Plaintiff's release from prison at a meaningful time and in a meaningful way.

148.     Plaintiff acted in reliance on the AUSAs' promise that his testimony before the grand jury would never be published or used against him and that they would vehemently advocate for his release, at a meaningful time and in a meaningful way, when he cooperated and testified against powerful gang members in gangs that had large presences in his prison.

149.     Helland and King made the above representations either with a reckless regard for their truth or knowing they were false, as an unknown AUSA obtained and released the grand jury testimony transcript in which Plaintiff

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

made potentially incriminating statements and when Helland and King refused to advocate for his release in 2003 at his first parole hearing, but instead a letter was submitted from their office advocating for Plaintiff's continued life sentence, and published part or all of Plaintiff's testimony before a grand jury that was sealed and elicited from Plaintiff with the promise by Helland and King that it would never be used in any such way.

150.    Plaintiff suffered severe injury as a direct result of Helland's, King's, and the Unknown AUSA's above-described misrepresentations in the form of doing another 17 years in prison, in having his parole denied, in having his hope and faith in humanity shattered.

WHEREFORE, as Plaintiff's injuries are a direct result of Defendants' clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

## COUNT V
**Michigan State Torts brought pursuant to 28 USC § 1346(b)** *et seq.*
**Civil Conspiracy**
**Breaching of Promise / Publication of Sealed Grand Jury Testimony**
(*As to Defendant United States*)

151.    Plaintiff incorporates by reference the foregoing paragraphs as if fully restated hereunder.

152.    Plaintiff had a clearly established Fifth Amendment right, applicable to the States via the Fourteenth Amendment, to the government's keeping its relied-on promises in all criminal judicial proceedings against Plaintiff.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

153.     This right included the right to Helland, King, and the Unknown AUSA keeping the promise which Plaintiff relied on to not have his sealed testimony published to the Michigan Parole Board and Detroit Police Department for consideration at Plaintiff's parole hearings.

154.     Additionally, Plaintiff has a fifth amendment procedural due process right to not have his sealed testimony published for consideration by the Michigan Parole Board, regardless of his reliance and/or promises not to publish it.

155.     Helland, King, and the Unknown AUSA had a singular plan to violate Plaintiff's above-described constitutional right and defraud Plaintiff by publishing his sealed grand jury testimony to his parole board.

156.     Helland, King, and the Unknown AUSA acted in concert to elicit the grand jury testimony from Plaintiff and then publish it.

157.     On Plaintiff's 2003 phone call with AUSA Lynn Helland, Helland told Plaintiff expressly that his "boss," named in this matter as Unknown Assistant United States Attorney, had obtained the sealed grand jury testimony.

158.     Helland, King, the Unknown AUSA and the City of Detroit acted in concert when the grand jury testimony was acquired by the Detroit Police Department for review by its officers to enable them to testify against Plaintiff at his 2003 parole hearing.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

159.    Helland, King, the Unknown AUSA and the City of Detroit violated
Plaintiff's said due process right when they published part or all of Plaintiff's
testimony before a grand jury that was sealed and elicited from Plaintiff with
the promise by Helland and King that it would never be used in any such way.

160.    Plaintiff suffered severe injury as a direct result of Helland's, King's,
the Unknown AUSA's, and the City of Detroit's above-described actions in
the form of doing another 17 years in prison, in having his parole denied, in
having his hope and faith in humanity shattered.

WHEREFORE, as Plaintiff's injuries are a direct result of Helland's, King's,
the Unknown AUSA's, and the City of Detroit's clear violation of his obvious
constitutional rights, justice demands that this Honorable Court grant Plaintiff's
requested relief.

### COUNT VI
**Michigan State Torts brought pursuant to 28 USC § 1346(b)** *et seq*.
**Civil Conspiracy**
**To Violate Plaintiff's Fourth Amendment Right to be Free From Illegal
Seizure Taking Plaintiff into Custody Throughout Childhood**

161.    Plaintiff incorporates by reference the foregoing paragraphs as if fully
restated hereunder.

162.    Plaintiff has a Fourth Amendment right, applicable to the States via the
Fourteenth Amendment, to be free from unlawful government seizures of his
person.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

163.     Dixon and Groman, acting in concert, violated said right, continuously, when they unlawfully seized Plaintiff time and again in 1984 through 1986, through a show of force and authority at Plaintiff, ordering him to get into their vehicles, go into drug houses, etc.

164.     Plaintiff, a child, submitted to all of the above-described shows of force and authority.

165.     Dixon's and Groman's acts themselves were illegal as they violated Plaintiff's Fourth Amendment rights to be free from illegal search and seizure, or they were in furtherance of an illegal goal, to contribute to the delegacy of a minor. (See Michigan Compiled Laws 750.145.)

166.     The injuries from the above-described violations of Plaintiff's Fourth Amendment right to be free from unlawful government seizure eventually led to his indoctrination as a drug dealing criminal and his serving 32 years and 7 months in prison. Plaintiff still suffers residual physical and psychological injuries as a direct result of Defendants above-described actions including but not limited to: severe anxiety, severe depression, severe paranoia, severe digestive issues, and incurable abdominal pains.

WHEREFORE, as Plaintiff's injuries are a direct result of Dixon's and Groman's clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

## COUNT VII

**Michigan State Torts brought pursuant to 28 USC § 1346(b) *et seq.***
**Civil Conspiracy**
**Violation of Constitutional Right to Family Integrity**

167.    Plaintiff incorporates by reference the foregoing paragraphs as if fully restated hereunder.

168.    Plaintiff had a First Amendment right to family integrity as a minor child in the 1980's.

169.    Dixon and Groman acted in concert when they deprived Plaintiff of that right by indoctrinating and grooming him into a criminal drug dealer and then failing to take any action to mitigate his separation from his family as a direct and obvious result of their actions.

170.    The Dixon and Groman had a single purpose in conspiring to violate Plaintiff's right to be with his family by having his 1) become a drug dealer and/or 2) be sent to prison.

171.    Dixon and Groman each participated in bringing about the constitutional violation by indoctrinating, grooming, or otherwise making Plaintiff into a drug dealing criminal. Dixon and Groman both forced Plaintiff to buy and sell drugs, to associate with gangsters, and condoned his keeping of drugs and eventual drug dealing.

172.    As the indoctrination and grooming of Plaintiff to become a drug dealer at such a young, tender, age did itself rob Plaintiff of his family integrity, it also failed to afford Plaintiff adequate due process of law, as is required before

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

government interference with one's First Amendment right to familial integrity.

173.     As a direct result of Defendants actions, Plaintiff spent 32 and 7 months years away from his family, was not allowed to say goodbye to his father or attend his funeral, was not allowed to raise his children, and even became a grandfather while in prison. Now that he is out, Plaintiff is practically a stranger to those closest to him.

WHEREFORE, as Plaintiff's injuries are a direct result of Dixon's and Groman's clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

## CONCLUSION AND RELIEF REQUESTED

Practitioners of law often fall into the mindset that for every legal question, there is either an answer to be found in our courts' jurisprudence or, at least, caselaw from which analogies can be made. However, sometimes the clearest answer is not the legal answer, but the equitable one. What these defendants helped do to Plaintiff is atrocious. There is no other case like Plaintiff's in United States history where a 14-year-old is used by federal and state law enforcement, shot and almost killed for his confidential informing, and then not just abandoned by the law enforcement he served but actively and unconstitutionally betrayed by them. Criminals have been wrongly convicted, minors have been given life sentences, but never has a child-confidential informant been so abused by law enforcement as these agents and

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

officers abused Plaintiff. As one former FBI agent finally had the courage to admit

in a 2012 letter to the Michigan Parole Board, no law enforcement agency lifted a

finger when Plaintiff was tried, out of a fear of 'embarrassment' for having so abused a child.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**Page 1 of 4**

Gregory H. Schwarz

June 19, 2012

RECEIVED
MI DEPT of CORRECTIONS

JUN 2 2 2012

Parole Board

Michigan Parole Board
State of Michigan
Department of Corrections
Grandview Plaza Building
PO Box 30003
Lansing, MI 48909

192034

Dear Parole Board Members,

Twenty five years have now passed on a sentence for Richard Wershe, Jr. As you know this case was for the crime of Possession of Controlled Substance of more than 650 grams. On 01/15/88 he received a life sentence. In federal court those with the same offense received only three years and yet Richard got life without parole. Richard was 17 years of age at the time. He is now 43years old and a man who regrets the actions of his youthful decisions. If I recall there were judges whom stated they disagreed with the law as it was far too stringent. I write this letter to you on behalf of numerous former agents of the federal government, former Police officers who had direct dealings with Richard and concerned citizens who have learned of his confinement and no apparent future with the parole board.

A compelling factor was that Richard was being used by the federal government and various police agencies as an operative or source. I know you were advised of this information at the time of his other hearings. During the various investigations he was directed to operate in the drug community and provide information to law enforcement. He performed these duties under the promise that he would receive consideration should he become involved himself. He did but as we know, no department or agency came to his rescue. At the time, his age was a factor and would have been an embarrassment to the federal government. As stated, several agencies promised intervention but it never occurred. Richard continued to cooperate.

After confinement, Richard was asked about the murder of a small boy, Damion Lucas by a particular gang. He provided information on that homicide as to the identity of the shooters which was covered up by the Detroit Police Department. I spoke to Michael Cox of Wayne County who, in front of me, stated that his cooperation would be of great help to the State. He provided the exact information the state needed and the state did nothing. On another matter, AUSA James King, in the presence of FBI Agents said he would get Wershe relief after he provided information on Best Friends which was a joint task force investigation. That consideration never occurred. Again USA Lynn Helland stated the office would help him if he provided information on the case involving Jimmy Harris, former Detroit Police officer. While Richard kept his end of the bargain and, provided most of the information, the federal government backed away.

6

Indeed, this is a unique case. Plaintiff is the youngest FBI informant in this history of this nation, known to this Plaintiff. Plaintiff also holds the record as the longest serving prisoner convicted as a juvenile on a nonhomicide offense in the State of Michigan. Our Constitution, our justice system, and God-given right to all humanity calls on this Court to finally bring justice to a man whose life has been taken from him at the tender age of 14 all the way up to 51 years of age. For conduct that was not of his free will, but that of a minor who has been used, abused, reused, and re-abused by those that have sworn to protect and serve this country.

Plaintiff's story has been told in multiple film documentaries and a Hollywood movie. Many people know Plaintiff's story in detail, and virtually all who do feel Plaintiff was unfairly and despicably abused by law enforcement.

WHEREFORE, Plaintiff requests that this Honorable Court enter judgement in his favor against all Defendants, jointly and severally, and issue an order containing the following relief:

   a) Declaring that Defendant United States, by and through its agents and actors, violated Plaintiff's Fifth Amendment rights when they indoctrinated Plaintiff into becoming a drug dealer as a child;

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

---

6 This document has been reviewed and verified by Plaintiff.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

b) Declaring that Defendant United States, through its federal agents and actors, violated Plaintiff's Fifth Amendment due process rights when they broke their promises to him to advocate on his behalf at his trial and before the Michigan Parole Board;

c) Declaring that Defendant United States, through its federal agents and actors, violated Plaintiff's Fifth Amendment due process rights when they conspired to publish Plaintiff's sealed grand jury testimony;

d) Declaring that Defendant United States, through its federal agents and actors, violated Plaintiff's Fourth Amendment due process right to be free from unlawful arrests, when they continuously used their authority to stop Plaintiff and force him into their vehicles to answer questions or receive drugs for drug dealing;

e) Declaring that all Defendant United States, through its federal agents and actors, violated Plaintiff's First Amendment right to family integrity;

f) Ordering Defendant United States to pay Plaintiff $100,000,000 for the intentional violations of his constitutional rights;

g) Ordering Defendant United States to pay Plaintiff's costs and attorney fees under the equal access to justice act; and

h) Any and all such other relief that this Court deems just and equitable including any tolling of limitations periods necessary to accomplish justice.

## DEMAND FOR TRIAL BY JURY

Plaintiff respectfully demands a trial-by-jury of his peers on all of the foregoing claims.

Respectfully submitted;

AYAD LAW, PLLC

*/s/Nabih H. Ayad*
Nabih H. Ayad (P59518)
*Attorneys for Plaintiff*
645 Griswold St., Ste 2202
Detroit, MI 48226
P: 313.983.4600
F: 313.983.4665
Dated: October 28, 2022          filing@ayadlawpllc.com

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I filed the foregoing paper and any attachments with the Clerk of Courts using the ECF electronic filing system.

Respectfully submitted;

AYAD LAW, PLLC

*/s/Nabih H. Ayad*
Nabih H. Ayad (P59518)
William D. Savage (P82146)
*Attorneys for Plaintiff*
645 Griswold St., Ste 2202
Detroit, MI 48226
P: 313.983.4600
F: 313.983.4665
Dated: October 28, 2022          filing@ayadlawpllc.com

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P.: (313) 983-4600 | F.: (313) 983-4665

## <u>AFFIDAVIT OF RICHARD J. WERSHE, Jr.</u>

I, RICHARD J. WERSHE, Jr, do depose and state the following under penalty of

perjury:

1.  I have personal knowledge of the facts alleged herein.

2.  I am competent and able to testify if called to do so.

3.  I make this affidavit of my own free will.

4.  I am also known as White Boy Rick, although I nor my friends and family

    have ever used that nickname.

5.  I was born on July 18, 1969.

6.  In 1984, at age 14, I was approached by FBI officer Jim Dixon to become an

    informant for the FBI and a joint task force it operated with the Detroit Police

    Department.

7.  As a fourteen-year-old to sixteen-year-old, I did not feel capable of denying

    or resisting the FBI agents and DPD officers when they gave me orders to get

    into their cars, trucks, or vans.

8.  The law enforcement officers were very assertive and I recall that they never

    asked me anything politely, but only gave me commands.

9.  I was a child while I worked for law enforcement in 1984-86, and did not fully

    comprehend the danger it placed me in.

10. When I went into dangerous drug houses, I did so because members of the FBI-DPD task force (often Groman, Jasper, or Greene) would parked in a van nearby and tell me: "It's okay, we're right here watching. They can't do anything to you, we're right here."

11. Looking back, it is hard for me to believe that I believed them that they would keep me safe, but I did because I was a child and only because I was a child.

12. After I was shot, Groman, Jasper, and Greene all came to my hospital bed and told me that I needed to say that the shooting was just an accident, that we had just been "playing" when I got shot. They said that would be "better for everyone."

13. I see now they meant themselves, because they would have all gotten fired and hopefully charged criminally if it came out that they were using a 14-15-year old confidential informant as a drug dealer.

14. I still have nightmares about being shot, where I remember laying on the floor bleeding out and begging Walker to call 9-1-1, and him just staring at me coldly, watching me die. Then him and his friend trying to stuff me into their car to go dump my dying body somewhere.

15. Looking back now, I see how gravely risky my actions were and how irresponsible the FBI (James Dixon, Herman Groman) and the Detroit Police (William Jasper, Kevin Greene) were to put me in such dangerous situations.

2

16. Had I not been an informant for the task force, I would never have gotten involved with drug gangs or criminality of any sort.

17. When I was convicted, I was incensed that the FBI and DPD, or at least members of the task force James Dixon, Herman Groman, William Jasper, and Kevin Greene did not come forward to assist me in criminal proceedings.

18. I recall I asked my then attorney William Bufalino if I could sue them, he told me to "keep my mouth shut" until I was out. He said it would be stupid for me to go after powerful law enforcement individuals like I wanted to and that it would ruin any chance we had of ever getting me out of prison. He assured me that any law enforcement or United States attorneys I sued would either have me attacked or killed in prison or ensure that I never got out, should I ever get a chance to be released early.

19. When I was 18, when I was first in prison, I was on the phone with my mom and I saw another prisoner stab a different prisoner in the neck. I remember I said "I have to go" and hung up.

20. I remember it terrified me. That was my introduction to life on the inside and that is something you never forget.

21. The lesson their being that life is fragile in prison. If someone wants you dead, its easy if you are in prison.

22. It was an assassination in prison. So when my attorneys or others said I could get killed while in prison for bringing a lawsuit, or causing problems for people on the outside with influence, I knew it was true.

23. Bufalino also assured me that I would have 1 year after I got out of prison to bring any lawsuits against the law enforcement responsible for my prison sentence, anyway, so I should wait.

24. I learned again while in prison that William Bufalino's advice about law enforcement possibly retaliating against me was exactly correct when the federal government had to put me in witness protection while in prison, because I was going to help them with Operation Backbone, a sting operation against corrupt Detroit Police.

25. I knew that if the federal government was so afraid that the state law enforcement would have me killed while I was in prison, that the danger of retaliation for going after law enforcement was real and that I needed to not bring any lawsuits against law enforcement while I was in prison if I wanted to ever get out of prison.

26. In 1991, Herman Groman and Lynn Hellend approached me and offered to do everything they could to get me out of prison if I helped them with a drug sting operation against corrupt Detroit cops.

27. I agreed only because I wanted out of prison so badly and I believed them when they said they would keep their end of the agreement.

28. Between 1994 and 1995, Assistant United States Attorney James King came to me and said that I testified before a grand jury about members of the Best Friends gang, he would go "balls to the wall" to get me out of prison.

29. I obviously was very concerned over my safety to testify against the Best Friends gang, just like I was concerned over helping take down corrupt Detroit police, but King assured me that my testimony would be kept under "seal."

30. So I agreed to that too, even though the testimony was in some senses incriminating, because I was promised it would never see the light of day after the grand jury heard it.

31. I agreed so that King and the United States Attorneys Office for the Eastern District of Michigan would help get me out of prison.

32. In 2003 when I first became eligible for parole, I saw law enforcement retaliate against me first hand, confirming my fears of retaliation by law enforcement.

33. The United States Attorneys Office of the Eastern District of Michigan illegally unsealed the grand jury testimony I had given, and that Lynn Hellend and James King had promised me would never be used against me, and sent it to the Michigan Parole Board right before my first parole hearing.

34. As well, the United States Attorneys Office for the Eastern District of Michigan sent a letter saying that they did not support my release, breaking the promise that was made to me.

35. That was all retaliation for testimony and information I had given years back.

36. I am confident that I would have been released on parole in 2003 had it not been for the United State Attorney letter and the unsealing of my grand jury testimony, especially because the Parole Board had done a home inspection for me, which is something that I have seen over my many years in prison is only done when the parole board itself believes that they will be letting a prisoner out on parole.

37. I was told by multiple federal attorneys and federal law enforcement, including Lynn Hellend in a phone call in 2003, that this was because someone in charge at the United States Attorneys Office for the Eastern District of Michigan was retaliating against me for having helped the federal government take down corrupt Detroit police.

38. I know I was the target of retaliation by law enforcement/individuals at the Department of Justice while I was in prison and I am 100% certain that I would not be out of prison today had I brought any legal actions against the law enforcement and Assistant United States Attorneys whose actions

resulted in my being in prison and not getting released on parole for so many years.

39. Later, I got as my attorney Ralph Musili. Ralph was a great attorney and I have great respect for him.

40. It was Ralph Musili that got me out. Instead of suing law enforcement and United States Attorneys for what they did to me, he sued the Michigan Parole Board for denying me a parole hearing. That lawsuit went up to the Sixth Circuit on appeal and the parole board agreed to let me out if we dropped the appeal, so we did, and I was finally paroled out.

41. I shared with Ralph my desire to take legal action against James Dixon, Herman Groman, William Jasper, Kev Greene, Lynn Hellend, James King, and their respective government agencies, and his advice to me was very similar as attorney Bufalino's.

42. Ralph told me to keep my head down and not rock the boat, to not try to sue any law enforcing on the outside because there was a high chance that they would retaliate against me and make sure I stayed in prison forever.

43. Just like Bufalino, Ralph Musili assured me on many occasions that I would have one years after I got out of prison to bring my lawsuit.

44. To me, it made absolute sense to wait until I was out before I tried to take action against the people responsible for getting me in prison.

45. If they could make sure I went to prison in the first place, it is obvious that they could make sure I didn't get out of prison.

46. As soon as I got out of prison, I worked diligently and began speaking with attorneys about bringing a potential lawsuit.

47. While I was in prison, every day was like being forced to relive my betrayal by James Dixon, Herman Groman, William Jasper, Kevin Greene, Lynn Hellend, James King, and their respective government agencies as I constantly worried about being attacked for informing, cooperating, and testifying against dangerous gangs and corrupt cops.

48. I still have nightmares about the horrors of prison, violence and cruelty by prisoners and prisons guards, getting shot, being set up and betrayed by the feds and Assistant United States Attorneys.

49. I continuously contacted all of the above to try to get them to help me as they promised they would and they continuously refused to do so.

50. There is no doubt in my mind, after what James Dixon, Herman Groman,

William Jasper, Kevin Greene, Lynn Hellend, James King, and their

respective government agencies did to me, twice, that they would have

retaliated against me while I was in prison and ensure that, either by natural

causes or not, I died in prison.

FURTHER AFFIANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and correct. (28 US Code § 1746.)

Dated this _____ day of _____ 20_____.

_____
(Signature of Affiant)

_____
(Printed name of Affiant)

50. There is no doubt in my mind, after what James Dixon, Herman Groman, William Jasper, Kevin Greene, Lynn Hellend, James King, and their respective government agencies did to me, twice, that they would have retaliated against me while I was in prison and ensure that, either by natura causes or not, I died in prison.

FURTHER AFFIANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and correct. (28 US Code § 1746.)

Dated this ___20th___ day of ___July_____ 20 _21___.

_Richard J. Weishe Sr._

(Signature of Affiant)

_Richard J. Weishe JR._

(Printed name of Affiant)

## AFFIDAVIT OF MICHELLE MacDONALD

I, MICHELLE MacDONALD, do depose and state the following under penalty
of perjury:

1. I have personal knowledge of the facts alleged herein.

2. I am competent and able to testify if called to do so.

3. I make this affidavit of my own free will.

4. I am the fiancée of Mr. Richard Wershe, Jr., known in the news as "White
   Boy Rick."

5. I have known Rick since we were in middle school together.

6. When Rick was paroled to serve a prison sentence in Florida, I went down to
   visit him.

7. Rick and I currently live together.

8. Rick frequently wakes us both up from sleep by having nightmares, which
   jar him awake and which he has told me are about his being shot when he
   was 15, and then later his being left in prison after the FBI, Detroit Police,
   and United States Attorneys for the Eastern District of Michigan broke their
   agreement with him to help him get out of prison if he risked his life to help
   them.

9. Rick and I have discussed his potential lawsuits against the law enforcement
   agents and the government many times over the years.

1

10. Rick has always maintained that he could not bring any lawsuits until he was out of prison because it would be "stupid" and "crazy" to bring a lawsuit against the government while he was in prison, as he believed that it would either get him killed or get him stuck in prison forever, by retaliation from those he sued.

11. I believe Rick was correct in that and I am happy he is out and can now bring his lawsuit.

12. I also heard at least twice his attorney Mr. Ralph Musilli tell him not to bring a lawsuit while he was in prison and risk retaliation and that he would have one year after he got out of prison to bring any such lawsuit.

13. I remember these conversations because it was hard for Rick to wait so long.

FURTHER AFFIANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and correct. (28 US Code § 1746.)

Dated this _____ day of _____ 20_____.

_____
(Signature of Affiant)

_____
(Printed name of Affiant)

10. Rick has always maintained that he could not bring any lawsuits until he was out of prison because it would be "stupid" and "crazy" to bring a lawsuit against the government while he was in prison, as he believed that it would either get him killed or get him stuck in prison forever, by retaliation from those he sued.

11. I believe Rick was correct in that and I am happy he is out and can now bring his lawsuit.

12. I also heard at least twice his attorney Mr. Ralph Musilli tell him not to bring a lawsuit while he was in prison and risk retaliation and that he would have one year after he got out of prison to bring any such lawsuit.

13. I remember these conversations because it was hard for Rick to wait so long.

FURTHER AFFIANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and correct. (28 US Code § 1746.)

Dated this _19th_ day of _July_ 20_21_.

_Michelle MacDonald_
(Signature of Affiant)

_Michelle MacDonald_
(Printed name of Affiant)

2

## <u>AFFIDAVIT OF MS. LYNNE HOOVER</u>

I, LYNN HOOVER, do depose and state the following under penalty of perjury:

1.  I have personal knowledge of the facts alleged herein.

2.  I am competent and able to testify if called to do so.

3.  I make this affidavit of my own free will.

4.  My late husband was Ralph Musilli, a well-known and highly respected Michigan Attorney.

5.  My husband represented Mr. Richard Wershe, who is known in the media as "White Boy Rick" for many years.

6.  Throughout many years of my husband's representing Mr. Werhse, he and I often discussed the case in detail.

7. It has always been my understanding that Mr. Wershe should not take any legal action against the government, law enforcement officers, or United States Attorneys (as Mr. Wershe wanted to) until he was out of prison, or else they would retaliate against him and he would never get out of prison.

FURTHER AFFIANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and correct. (28 US Code § 1746.)

Dated this _____ day of _____ 20_____.

_____

(Signature of Affiant)

_____

(Printed name of Affiant)

7. It has always been my understanding that Mr. Wershe should not take any legal action against the government, law enforcement officers, or United States Attorneys (as Mr. Wershe wanted to) until he was out of prison, or else they would retaliate against him and he would never get out of prison.

FURTHER AFFIANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and correct. (28 US Code § 1746.)

Dated this _19th_ day of _July_ 20 _21_.

_Lynne hooven_
(Lynne Hoover)

_Lynne Hoover_
(Printed name of Affiant)



**U.S. Department of Justice**

Civil Division, Torts Branch
Federal Tort Claims Act Staff

_____

*Post Office Box 888*
*Benjamin Franklin Station*
*Washington, D.C. 20044*

JGT:GKJ:RNunez:rn
157-16-69200

APR 2 8 2022

CERTIFIED MAIL - 7018 0360 0000 2631 9206
RETURN RECEIPT REQUESTED

Mr. Nabih H. Ayad
Ayad Law, PLLC
645 Griswold Street
Suite 2202
Detroit, MI 48226

      Re: <u>Administrative Tort Claim of Richard J. Wershe, Jr.</u>

Dear Mr. Ayad:

      We have reviewed the administrative tort claim you submitted on behalf of your client, Mr. Richard Wershe, Jr., to the U.S. Department of Justice on July 27, 2021, relative to the alleged acts or omissions of employees of the United States Attorney's Office for the Eastern District of Michigan and the Federal Bureau of Investigation occurring from 1983 to 2020. After careful consideration, it has been determined that your claim is not compensable. Accordingly, the claim must be and hereby is denied.

      I am required by law (28 C.F.R. §14.9(a)) to inform you that, if you are dissatisfied with the denial of your client's claim under the Federal Tort Claims Act, you may file suit in an appropriate United States District Court no later than six months after the date of mailing of this notification. 28 U.S.C. § 2401(b).

                Very truly yours,

                JAMES G. TOUHEY, JR.
                Director, Torts Branch